**Jon M. Egan**, OSB 002467
Jegan@eganlegalteam.com
Jon M. Egan, PC
547 Fifth Street
Lake Oswego, OR 97034-3009
Telephone: (503) 697-3427
Fax: (866) 311-5629
Attorney for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **JESUSA LLANES**,<br>                              Plaintiff,<br>              vs.<br>**ANDREA ZALEWSKI**, an individual, and<br>**SILVER RIDGE ADULT FOSTER CARE<br>HOME LLC**, an Oregon limited liability<br>company,<br>                              Defendants. | Case No. 3:18-cv-00267-SB<br><br>Plaintiff's motion for summary<br>judgment<br><br>Oral argument requested |

## TABLE OF CONTENTS

I.  Plaintiff is entitled to summary judgment on her claims ............................................. 1
    A. Plaintiff is entitled to summary judgment on her FLSA minimum-wage
       claim.................................................................................................................... 1
    B. Plaintiff is entitled to summary judgment on her FLSA overtime claim ................ 4
    C. Both defendants employed plaintiff................................................................... 6
II. Plaintiff is entitled to summary judgment on Silver Ridge's affirmative defenses ...... 6
    A. Plaintiff is individually covered under the FLSA ................................................. 7
    B. Silver Ridge is covered as an enterprise under the FLSA ...................................... 9
    C. Plaintiff's claims against Silver Ridge are not barred by the statute of
       limitations......................................................................................................... 14
    D. Silver Ridge has no valid *in pari delicto* defense ................................................17
    E. Silver Ridge acted willfully ............................................................................... 19
III. Plaintiff is entitled to summary judgment on defendants' counterclaims ................20
    A. Andrea Zalewski's first counterclaim is invalid ................................................20
    B. Andrea Zalewski's second "counterclaim" is invalid ..........................................20
    C. Andrea Zalewski's third "counterclaim" is invalid ............................................. 21
    D. Silver Ridge's counterclaim is invalid ..............................................................22
IV. Plaintiff is entitled to summary judgment on her own counterclaims.....................23
    A. Plaintiff is entitled to summary judgment on her eviction counterclaim ............23
    B. Plaintiff is entitled to summary judgment on her conversion counterclaim .........25
    C. Plaintiff is entitled to summary judgment on her intentional infliction of
       emotional distress counterclaim ......................................................................... 25
V. Conclusion ...............................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) ............................................. 2

*Bao Yi Yang v. Shanghai Gourmet, LLC*, 471 F.App'x 784 (9th Cir. 2012) ...................... 4

*Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299 (1985)........................ 17, 18

*Bautista Hernandez v. Tadala's Nursery, Inc.,* 34 F.Supp.3d 1229 (S.D.Fla. 2014) ...... 18

*Baxter v. M.J.B. Inv'rs*, 128 Or.App. 338 (1994)............................................................. 13

*Biggs v. Wilson*, 1 F.3d 1537 (9th Cir. 1993)..................................................................... 1

*Chao v. A-One Medical Services, Inc.*, 346 F.3d 908 (9th Cir. 2003) .............................. 15

*Dixon v. Open Hands Nurseing Agency, LLC*, No. 4:17-CV-02132-RBH, 2018 WL
    5995127 (D.S.C. Nov. 14, 2018) ................................................................................... 8

*Flores v. City of San Gabriel*, 824 F.3d 890 (9th Cir. 2016)......................................... 4, 14

*Hugler v. Westside Drywall, Inc.*, No. 3:15-cv-02411-BR, 2017 WL 1027026 (D.Or. Mar.
    14, 2017) ...................................................................................................................... 15

*Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573 (2010) ........... 14

*Kim v. Hopfauf*, No. 1:15-CV-9127, 2017 WL 85441 (N.D. Ill. Jan. 10, 2017) ................ 7

*Lamonica v. Safe Hurricane Shutters, Inc.,* 711 F.3d 1299 (11th Cir.2013) .................... 18

*Litzendorf v. Prop. Maint. Sols. LLC*, No. CV-16-00271-PHX-GMS, 2017 WL 5900830
    (D.Ariz. Nov. 30, 2017) .................................................................................................. 7

*Maldonado v. Alta Healthcare Grp., Inc.*, 17 F.Supp.3d 1181 (M.D.Fla. 2014) ............. 13

*Marshall v. Sunshine & Leisure, Inc.,* 496 F.Supp. 354 (M.D.Fla.1980) ........................ 13

*McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988)................................................... 14

*Mustola v. Toddy,* 253 Or 658 (1969) .............................................................................. 25

*Pinter v. Dahl,* 486 U.S. 622 (1988) ................................................................................ 18

*Quinonez v. Reliable Auto Glass, LLC*, No. CV-12-000452-PHX-GMS, 2012 WL
    2848426 (D.Ariz. July 11, 2012) .................................................................................... 7

*Richland Cty. Ass'n for Retarded Citizens v. Marshall*, No. CV-77-56-BLG, 1978 WL
    1774 (D.Mont. Apr. 10, 1978) ....................................................................................... 11

*Sanchez–Calderon,* 995 F.Supp. 1098 (D.Or.1997) ........................................................ 19

*Schiele v. Montes,* 231 Or App 43(2009)......................................................................... 26

*Vallejo v. Azteca Elec. Const. Inc.,* No. CV-13-01207-PHX-NVW, 2015 WL 419634
    (D.Ariz. Feb. 2, 2015) ................................................................................................... 17

*Watkins v. Ameripride Services*, 375 F.3d 821 (9th Cir. 2004)......................................... 8

## Statutes

29 U.S.C. § 203(d) ............................................................................................................. 6

29 U.S.C. § 203(s).............................................................................................................. 11

29 U.S.C. § 203(s)(1)(B) .................................................................................. 9, 10, 12, 13

29 U.S.C. § 206 .................................................................................................................. 1

29 U.S.C. § 206(a)(1) ......................................................................................................... 9

29 U.S.C. § 207 .................................................................................................................. 4

29 U.S.C. § 207(a)(1) ......................................................................................................... 9

29 U.S.C. § 211(c)............................................................................................................... 2

29 U.S.C. § 216(b).....................................................................................................1, 3, 4

29 U.S.C. § 255 ................................................................................................................ 14

O.R.S. § 91.122(2)........................................................................................................... 23

**Regulations**

29 C.F.R. 785.23 ................................................................................................ 2

O.A.R. 411-050-0625(1)(a)(A) ............................................................................ 2

O.A.R. 839-020-0042(3) ..................................................................................... 2

**Other Authorities**

S.Rep. 89-1487, 1966 U.S.C.C.A.N. 3002 ........................................................ 10

U.S. Dep't of Labor, Opinion Letter (March 5, 1999) ....................................... 7

U.S. Department of Labor Wage and Hour Division's FIELD OPERATIONS HANDBOOK §
   12g02 ............................................................................................................. 12

USDOL ADMINISTRATOR INTERPRETATION 2014-1........................................ 10, 11

Plaintiff's counsel hereby certifies that he conferred via telephone with defense counsel regarding this motion, and that the motion is opposed. Plaintiff moves for summary judgment on all of her claims, all of defendants' affirmative defenses, all of defendants' counterclaims, and all of plaintiff's counterclaims. This motion is supported by the documents already on file in this case, as well as the Declarations of Jon M. Egan, Michèle Lauzier, and Jesusa Llanes submitted herewith.

## I. Plaintiff is entitled to summary judgment on her claims

Most of the real issues in this case pertain to coverage under the statute and other qualitative issues. The prima facie analysis is very straightforward. Plaintiff is entitled to summary judgment on her FLSA minimum-wage and overtime claims. Neither defendant alleges that plaintiff is exempt from minimum wage or overtime under the FLSA.

## A. Plaintiff is entitled to summary judgment on her FLSA minimum-wage claim

29 U.S.C. § 206 requires employers to pay employees at least the amount of the federal minimum wage, when those wages are due. *Biggs v. Wilson*, 1 F.3d 1537, 1538 (9th Cir. 1993). 29 U.S.C. § 216(b) provides that "Any employer who violates the provisions of section 206 … of this title shall be liable to the employee … in the amount of their unpaid minimum wages…, and in an additional equal amount as liquidated damages."

Plaintiff was paid monthly. From the beginning of her employment through June 30, 2016, plaintiff's regular payday for each month was the 8th of the following month. Exhibit 3 to Llanes Dec., at AZ0231, AZ0019. From July 1, 2016 through the end of plaintiff's employment, plaintiff's regular payday for each month was the 10th of the following month. *Id.* at AZ0024.

**Plaintiff's Motion for Summary Judgment**                                   Page 1

From July 9, 2014 through March 5, 2015, plaintiff worked from 6 a.m. through 10 p.m., Wednesday through Sunday. Exhibit 3 to Llanes Dec. at AZ0232. That is a 16-hour day, 80 hours per week. From March 5, 2015 through her termination, plaintiff worked from 7 a.m. through 10 p.m., Wednesday through Sunday. *Id.* at AZ0018–19, AZ0023. That is 15 hours per day, 75 hours per week. Plaintiff's contemporaneous calendars also tracked which days she worked, and when she took her vacations. Dkt. 48-4; Exhibit 1 to the Declaration of Jon M. Egan submitted herewith. Defendants have provided no evidence that plaintiff ever received a full uninterrupted 30-minute meal period during her employment, and plaintiff confirms that she never did. Thus, using these numbers, Exhibit 1 to the Declaration of Michèle Lauzier submitted herewith lays out the hours per week and month that Ms. Llanes worked.

Typically, because it is an employer's statutory obligation to track employees' time (29 U.S.C. § 211(c)), employers cannot object to an employee's failure to prove their FLSA damages with specificity. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946). As a matter of just and reasonable inference, an employee makes their best estimate as to unpaid overtime, and it is then the employer's burden to disprove those estimates. *Id.*

In our case, plaintiff was required to be on duty at the home for five straight days, 24 hours per day. *See* O.A.R. 411-050-0625(1)(a)(A) ("There is, or shall be upon licensure, an approved resident manager who lives in the home and works five consecutive days and nights per week as the primary caregiver."). The law allows employers not to pay for sleep time in such circumstances, and reasonable agreements as to compensable time will be enforced. O.A.R. 839-020-0042(3); 29 C.F.R. 785.23. Plaintiff and defendants did that through the employment agreements attached as Exhibit 3 to Llanes Dec. As

**Plaintiff's Motion for Summary Judgment**                                    Page 2

such, it is those agreements, not any recollection as to hours worked on a given day, that control. It is worthy of note, however, that all of the evidence in this case agrees with those estimates—plaintiff has asserted that she worked far in excess of 40 hours per week, that she was never paid for that time, that defendants' own contracts call for 15 to 16-hour days, 5 days per week, and her contemporaneous records bear that out.

Thus, for June 2016, defendants' regular payday was July 10, 2016. Payment was not made until July 11, 2016. Exhibit 2 to Egan Dec. Plaintiff worked 255 hours during that pay period (Exhibit 1 to Lauzier Dec.), so under federal law, she was owed at least $1,848.75 (255 hours x federal minimum wage of $7.25) on the July 10, 2016 payday for that pay period. However, defendants failed to pay plaintiff anything at all on payday. While plaintiff has no "unpaid minimum wages" remaining due, (because they were later paid on July 11, 2016), she is still entitled to "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Plaintiff is therefore entitled to $1,848.75 in federal FLSA minimum-wage liquidated damages for the June 2016 pay period.

Similarly, for September 2017, defendants' regular payday was October 10, 2017. Payment was not made until October 13, 2017. Exhibit 2 to Egan Dec. Plaintiff worked 330 hours during the September 2017 pay period (Exhibit 1 to Lauzier Dec.), so under federal law, she was owed at least $2,392.50 (330 hours x federal minimum wage of $7.25) on the October 10, 2017 payday for that pay period. Defendants failed to pay plaintiff anything at all on payday. While plaintiff has no "unpaid minimum wages" remaining due, (because they were later paid on October 13, 2017), she is still entitled to "an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). Plaintiff is therefore entitled to $2,392.50 in federal FLSA minimum-wage liquidated damages for the September 2017 pay period.

**Plaintiff's Motion for Summary Judgment**                                    Page 3

Plaintiff's total minimum-wage liquidated damages due are thus $4,241.25.

## B. Plaintiff is entitled to summary judgment on her FLSA overtime claim

29 U.S.C. § 207 requires employers to pay 1½ times an employee's regular rate of pay for all hours worked in excess of 40 per workweek. 29 U.S.C. § 216(b) provides that "Any employer who violates the provisions of ... section 207 of this title shall be liable to the employee ... in the amount of their ... unpaid overtime compensation..., and in an additional equal amount as liquidated damages."

The usual way to calculate the regular rate is to divide the employee's gross wages by the number of hours for which those wages are paid. However, the value of plaintiff's room and board must also be included in her regular rate in determining the overtime to which she is due. *Flores v. City of San Gabriel*, 824 F.3d 890, 898–99 (9th Cir. 2016) ("the examples given in § 778.224(a) of payments that were not intended to be excluded under the 'other similar payments' clause, such as bonuses or room and board, are commonly considered to be compensation"); *Bao Yi Yang v. Shanghai Gourmet, LLC*, 471 F.App'x 784, 786–87 (9th Cir. 2012) ("Under the FLSA, then, Wang's and Yang's regular rates of pay should have been determined by dividing their weekly salaries, including the value of the room and board provided to them, by the total number of hours that they worked each week.").

The value of plaintiff's room and board was agreed to by the parties in their employment contract. Exhibit 3 to Egan Dec., Zalewski deposition at 60:3 to 61:2, 68:3 to 68:16:

```
                    60
3   Q.  Right.  And then I think in the second two
4   contracts, you assigned a value of how much she was
5   getting. If you wanted to look at those, those are
6   in the different part.  They're like starting at
7   AZ-18.
```

8    A.  Oh, I think I know what you mean, yeah.
9  Yeah, and the reason that I did that, I think, was
10  in response to a training that I did.  It may have
11  been with the employment department.  I think it was
12  a training with the employment department who said,
13  You're kind of supposed to attach an actual number,
14  and this is where you come up with -- this is how
15  you can come up with a number of value to what you
16  are offering.
17    Q.  And how did they -- like how do you come
18  up with that number?
19    A.  Basically, you just use the -- that year's
20  index, cost of living index.  So it would be around
21  the same for the same amount of space, in the
22  Portland area.
23    Q.  Okay.  I see.  And that basically says,
24  here's how much it takes one person for room and
25  board for a year, on average, and you just use that
                          61
1  number?
2    A.  Yeah.
...
                          68
3  Q.  All right.  Let's go to AZ-239.  And I'm
4  just trying to -- this part at the bottom where it
5  says, "Our contract from July 2014 does not state an
6  amount for room and board, but it was free of charge
7  for employee and her family."
8    A.  Mm-hmm.
9    Q.  So I understand that to be like, in the
10  second contract, I think it was $400 and something
11  dollars.  We'll look at it in a minute.  And then
12  after that, I think it was $700.  You're saying you
13  didn't put a specific monthly value in the first
14  contract, but it was still basically the same idea,
15  even though there was no dollar figure put on it?
16    A.  Right.

Plaintiff has therefore factored the agreed room-and-board values into her regular rate

as used on Exhibit 1 to Lauzier Dec. The amount of hours that plaintiff's salary is

intended to cover are taken from plaintiff's paychecks (Exhibit 2 to Llanes Dec.), and the

resulting formula is salary plus room and board, divided by the hours listed on the

paycheck for the month:

**Plaintiff's Motion for Summary Judgment**                              Page 5

| Time period | Salary | Room and Board | Total monthly | Hours paid | Regular Rate |
|---|---|---|---|---|---|
| 7/1/16–end | $3,000 | $700.00 | $3,700.00 | 173.33 | $21.35 |
| 3/5/15–6/30/16 | $3,000 | $409.60 | $3,409.60 | 173.33 | $19.67 |
| 7/9/14–3/4/15 | $2,700 | $409.60 | $3,109.60 | 173.33 | $17.94 |

Thus, using the hours as calculated above in section I.A. and the regular rate calculated according to the above formulation, plaintiff's unpaid overtime equals $110,642.81, with liquidated damages due of $110,642.81. Exhibit 1 to Lauzier Dec.

Plaintiff's overtime damages are therefore $221,285.62.

## C. Both defendants employed plaintiff

Under the FLSA, "employer" is defined to include "any person acting directly or indirectly in the interest of an employer in relation to an employee". 29 U.S.C. § 203(d). The Court can take judicial notice that Ms. Zalewski is the sole owner, shareholder, member, and manager of Silver Ridge Adult Foster Care Home LLC. *See* Oregon Secretary of State listing. *See also* Zalewski deposition, Exhibit 3 to Egan Dec., at 40:13 to 40:17 ("I mean, I made a reference to the mom and pop thing. It's really just mom now. So I'm kind of wearing all of the hats, so to speak, for a very small business like this."), 94:5 to 94:10 ("So the company is Silver Ridge Adult Foster Care Home LLC, correct? A. Yes. Q. And you are the sole manager, member, registered agent? You're everything now, right? A. Yes."). It is uncontroverted that Ms. Zalewski personally took every action at issue in this case. Plaintiff is therefore entitled to summary judgment against both defendants as her employers.

## II. Plaintiff is entitled to summary judgment on Silver Ridge's affirmative defenses

Defendant Andrea Zalewski has not alleged any affirmative defenses. Plaintiff responds as follows to the affirmative defenses alleged by defendant Silver Ridge Adult

**Plaintiff's Motion for Summary Judgment**                                    Page 6

Foster Care Home LLC.

## A. Plaintiff is individually covered under the FLSA

Defendant Silver Ridge Adult Foster Care Home LLC has alleged:

> **FIRST AFFIRMATIVE DEFENSE**
> **(Failure to state a claim - no individual liability)**
> 14.
> The plaintiff failed to allege and cannot allege that she was engaged in
> interstate commerce.

To qualify for individual coverage under the FLSA, plaintiff must establish that she was engaged in interstate commerce in each week of her employment. Courts have recognized the Department of Labor's position that employees are "individually covered under the FLSA if, in the performance of their duties," they "regularly handle interstate mail and telephone calls, engage in banking or credit card transactions, or receive or handle goods or materials from or destined for out-of-state sources." *See, e.g.*, *Kim v. Hopfauf*, No. 1:15-cv-9127, 2017 WL 85441, *2 (N.D. Ill. Jan. 10, 2017), citing U.S. Dep't of Labor, Opinion Letter (March 5, 1999).

Thus, an employee's purchase of items that have moved in interstate commerce for use in the employer's business constitutes that employee participating in interstate commerce. *Litzendorf v. Prop. Maint. Sols. LLC*, No. CV-16-00271-PHX-GMS, 2017 WL 5900830, *3 (D.Ariz. Nov. 30, 2017); *Quinonez v. Reliable Auto Glass, LLC*, No. CV-12-000452-PHX-GMS, 2012 WL 2848426, *3 (D.Ariz. July 11, 2012). It is uncontroverted that plaintiff did 60–90 minutes of grocery shopping for the home at least weekly, including the purchase of items that originated out of state. Llanes Dec. at ¶ 7, pp. 2–3.

Similarly, an employee's purchase, receipt, and/or processing of items that have moved in interstate commerce, on behalf of and for later delivery to customers or patients of the employer, also constitutes that employee participating in interstate

commerce. *Watkins v. Ameripride Services*, 375 F.3d 821, 825 (9th Cir. 2004) ("We have held that even intrastate deliveries can be considered part of interstate commerce if the property in question was originally delivered from out-of-state and the intrastate route is merely part of the final phase of delivery."); *see also*, *Dixon v. Open Hands Nurseing Agency, LLC*, No. 4:17-CV-02132-RBH, 2018 WL 5995127, *5 (D.S.C. Nov. 14, 2018) ("With respect to individual coverage, Defendant first argues that Plaintiff is not engaged in interstate commerce and cannot produce any evidence suggesting otherwise because the nature of Defendant's business is home-based community services. ... Plaintiff [provides an affidavit stating] that shipments of medications came shipped from Kansas, and that Plaintiff used products with labels stating they were manufactured in Illinois, New Jersey, and other places outside of South Carolina. ... [A]ssuming all of Plaintiff's statements within his affidavit are true, these statements alone suffice to establish coverage under the FLSA."). It is uncontroverted that plaintiff on at least a weekly basis purchased and picked up groceries on behalf of and for delivery to residents, including groceries that originated in interstate commerce; used instrumentalities of interstate commerce to refill prescription medications and picked up and purchased those medications at the local pharmacy on behalf of and for delivery to residents of the home, including medications that originated out of state; received direct delivery of intra- and interstate mail and parcel deliveries and distributed them to residents; and received and processed both inter- and intrastate deliveries of food, groceries, and other household goods ordered via internet by defendants.

Plaintiff is therefore entitled to summary judgment on the issue of individual coverage under the FLSA.

**Plaintiff's Motion for Summary Judgment**                    Page 8

## B. Silver Ridge is covered as an enterprise under the FLSA

Defendant Silver Ridge Adult Foster Care Home LLC has alleged:

**SECOND AFFIRMATIVE DEFENSE**
**(Failure to state a claim - no enterprise liability)**
15.

The plaintiff failed to allege and cannot allege that Silver Ridge is an enterprise or enterprise engaged in commerce.

Under 29 U.S.C. §§ 206(a)(1) and 207(a)(1), an employee is within the coverage of the Act if he or she is "employed in an enterprise engaged in commerce." Under 29 U.S.C. § 203(s)(1)(B), "enterprise engaged in commerce" includes any enterprise that "is engaged in the operation of … an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution," whether or not such enterprise does over $500,000 worth of annual business.

There can be no question that defendants' business is "primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such an institution." The patients housed in defendants' care home are both aged and mentally ill. Llanes Dec. at ¶¶ 8–9.

Defendants' chief argument to date to avoid enterprise coverage has been a legal one, *i.e.*, that Silver Ridge Adult Foster Care Home is not an "institution," but defendants are relying on a *child* foster home case. Defendants do not operate a *child* foster home, receiving cost reimbursement from the state for essentially volunteer labor. Defendants operate a for-profit Level 2 *Adult* Foster Care Home, licensed by the state to receive Medicaid funds to care for mentally ill and defective senior citizens. Zalewski deposition, Exhibit 3 to Egan Dec. at 26:25 to 27:2 ("I haven't had a private pay client in about eight years.  I only take lower paying Medicaid clients."). Plaintiff is not aware of any published case in which a for-profit adult foster care home has been found not to be

an "institution" qualifying for enterprise coverage under 29 U.S.C. § 203(s)(1)(B).

Indeed, the 1966 bill extending FLSA coverage to previously exempted hospital and

nursing home employees specifically identified "homes for the aged" as intended to be

covered under the FLSA going forward:

> **Specific categories of employment affected by bill**
> Specific categories of employment that will be affected by the
> committee's bill are as follows:
> …
>  (5) Hospitals and related institutions.--- Employees of hospitals,
> nursing homes, and homes for the aged are presently exempted from
> the act under section 13(a)(2)(iii). The bill repeals this exemption and
> amends section 3 thereby extending coverage to such employees of
> such enterprises without regard to their annual dollar volume of sales
> or business. This will provide minimum wage protection for
> approximately 1,471,000 employees of non-Federal hospitals,
> nursing homes, and homes for the aged.

S.Rep. 89-1487, 1966 U.S.C.C.A.N. 3002, 3015.

   In addition, the topic of adult foster care homes specifically arose in the discussions

surrounding the Department of Labor's interpretation of the "institution" coverage

section. *See* USDOL Administrator Interpretation 2014-1, at 5–6, n.6:

> Because questions about adult foster care arose during the
> rulemaking process, the Department touched on the issue in the
> preamble to the Final Rule, "recogniz[ing] that it is possible that
> certain shared living arrangements may fall within the Department's
> exception for foster care parents, provided specific criteria are met."
> Specifically, the preamble noted that situations in which the
> Department has considered child foster care to be outside the
> application of the FLSA are those in which payment to the foster care
> parents "is primarily a reimbursement of expenses for rearing the
> child." Upon further review, however, the Department does not
> believe it is in the best interest of consumers, home care providers, or
> shared living program administrators to analogize to this special
> analysis for child foster care. The focus on the reimbursement of
> expenses is an indication that the analysis relies on the principle that
> foster parents are volunteers. Although adult foster care providers
> may well choose to take on that role in part out of generosity and
> kindness, they are not volunteers reimbursed for expenses, but
> rather—like teachers, child care providers, and others whose talents
> at their jobs may be enhanced by a personal enjoyment and

> commitment to their students or charges—workers who are paid for
> providing services. Indeed, Medicaid funds the services provided in
> many state adult foster care programs. And as a reflection of the
> important and often difficult work they do, home care providers are
> paid more than "nominal fees," which precludes them from being
> considered volunteers under the FLSA.

In fact, that Administrator Interpretation then goes on to specifically indicate that, while owner/operators of adult foster care homes may or may not be employees under the FLSA, their employees almost certainly qualify for coverage:

> This analysis goes to the status of an adult foster care provider, not
> any worker hired by the provider or a third party to provide
> assistance when the adult foster care provider is unavailable or
> otherwise needs relief from her responsibilities. Under the FLSA,
> such a relief worker is likely an employee of the provider and/or a
> third party administering the arrangement and thus is likely entitled
> to the protections of the Act.

*Id.* at 7 n.7.

Similarly, published cases hold adult foster care home employers to be enterprises engaged in commerce under the act. In *Richland Cty. Ass'n for Retarded Citizens v. Marshall*, No. CV-77-56-BLG, 1978 WL 1774, *4–5 (D.Mont. Apr. 10, 1978), *rev'd on other grounds,* 660 F.2d 388 (9th Cir. 1981), for example, defendants ran "The Sidney Group Home," which was a residential care facility for up to eight developmentally disabled adults, operated out of a single-family-style home in a residential subdivision outside of Sidney, Montana. The Court explained why the term "institution" in 29 U.S.C. § 203(s) should not be read narrowly: "The Supreme Court has held on numerous occasions that the Act is remedial in nature and therefore subject to a construction as broad as its terms will allow. ... To construe the term 'institution' narrowly would do violence to the intent of Congress, expressed in the 1966 amendments to the Act, that the protection of the Act be extended to employees of nursing homes not previously covered. The fact that Congress intended to extend coverage to nursing homes, which

**Plaintiff's Motion for Summary Judgment**                                        Page 11

may not technically qualify as 'institutions' under the jargon of the industry, suggests that Congress did not select the term 'institution' with its technical usage in mind. The term 'institution' is broad enough to cover the Sidney Group Home, and the related activities incident to the operation of the Home therefore constitute an 'enterprise'." *Id.*

As in the present case, The Sidney Group Home's "employees handle items such as foodstuffs and cleaning supplies which have travelled in interstate commerce. ... The group home is not the ultimate consumer of the items, since they are purchased primarily for the ultimate use and benefit of the patients." Thus, Silver Ridge Adult Foster Care Home is an "institution" as that term is used in 29 U.S.C. § 203(s)(1)(B).

Nor is any specific level of "care" required in order for an employer to qualify as an "institution" under 29 U.S.C. § 203(s)(1)(B). Even general observation is enough. *See, e.g.*, U.S. Department of Labor Wage and Hour Division's FIELD OPERATIONS HANDBOOK § 12g02 ("Institutions primarily engaged in the care of the sick, the aged, the mentally ill, or individuals with disabilities residing on the premises defined. Such an institution (other than a hospital) is an institution primarily engaged in (i.e., more than 50 percent of the income is attributable to) providing domiciliary care to individuals who reside on the premises and who have a disability or, if suffering from sickness of any kind, will require only general treatment or observation of a less critical nature than that provided by a hospital. Such institutions are not limited to nursing homes, whether licensed or not licensed, but include those institutions generally known as nursing homes, rest homes, convalescent homes, homes for the elderly, and the like."). Florida courts (which have substantial experience in evaluating facilities that care for the elderly) have held that assistance with activities of daily living such as that provided by plaintiff constitutes "care" in the context of a home for the aged or infirm, without any need for the provision

of qualified medical or hospital-like services. *Compare, e.g.,* Declaration of Llanes at ¶ 7, with *Maldonado v. Alta Healthcare Grp., Inc.*, 17 F.Supp.3d 1181, 1189 (M.D.Fla. 2014) ("Moreover, it is clear that the services provided by the ALFs constitute 'care', as the staff members assist the residents with bathing, dressing, hygiene, and self-administration of medication, perform housekeeping and laundry services, provide companionship, and prepare meals.") and *Marshall v. Sunshine & Leisure, Inc.,* 496 F.Supp. 354, 356–59 (M.D.Fla.1980) (finding, as a matter of law, that defendant was primarily engaged in the "care" of the elderly where employees assisted the residents with walking, bathing, and hygiene, provided housekeeping and laundry services, prepared food, and were available around-the-clock to assist residents with such personal needs in the middle of the night).

Finally, though not binding on this Court in terms of interpreting the federal FLSA, the Oregon Court of Appeals has indicated that Adult Foster Care Homes licensed by the state of Oregon are intended to be covered as "institutions" under the FLSA. *Baxter v. M.J.B. Inv'rs*, 128 Or.App. 338, 347 n.6 (1994) ("The federal Fair Labor Standards Act applies to defendant [an Adult Foster Care home licensed by the state of Oregon], because defendant is an 'enterprise engaged in commerce or in the production of goods for commerce,' which is defined in part as an enterprise that 'is engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution, a school for mentally or physically handicapped or gifted children, a preschool, elementary or secondary school, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit)[.]' 29 U.S.C. § 203(s)(1)(B).").

For all of the above reasons, plaintiff is entitled to summary judgment on

**Plaintiff's Motion for Summary Judgment**                                    Page 13

defendants' enterprise coverage under the FLSA.

## C. Plaintiff's claims against Silver Ridge are not barred by the statute of limitations

Defendant Silver Ridge Adult Foster Care Home LLC has alleged:

**THIRD AFFIRMATIVE DEFENSE**
**(Statute of limitations)**
16.

Plaintiff's claims are barred in whole or part by the applicable statutes of limitation.

Defendants do not identify which statutes of limitations they are alleging, nor why or which part of plaintiff's claims are allegedly barred. Plaintiff is only seeking recovery for three years of violations. Exhibit 1 to Lauzier Dec. The FLSA provides a three-year statute of limitations for willful violations. 29 U.S.C. § 255. In this context, "willful" means that the employer either knew or showed reckless disregard for whether its conduct was prohibited by the FLSA. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 130 (1988). Subjective knowledge that an employer's conduct violates the law is not required. *See, e.g.*, *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 582–83 (2010) ("We have long recognized the common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally. Our law is therefore no stranger to the possibility that an act may be intentional for purposes of civil liability, even if the actor lacked actual knowledge that her conduct violated the law.") (internal citations and quotations omitted); *Flores v. City of San Gabriel*, 824 F.3d 890, 906–07 (9th Cir. 2016) ("An employer need not violate the statute knowingly for its violation to be considered 'willful' under § 255(a) … The three-year statute of limitations may be applied where an employer disregarded the very possibility that it was violating the statute. An employer's violation of the FLSA is 'willful' when it is on notice of its FLSA requirements, yet takes no affirmative action to

**Plaintiff's Motion for Summary Judgment**                                    Page 14

assure compliance with them.") (internal citations and quotations omitted)).

Courts have found that an employer telling employees that they are not entitled to overtime shows willfulness when the employer turns out to be wrong about that entitlement. For example, in *Chao v. A-One Medical Services, Inc.*, the Ninth Circuit held the uncontroverted statements by the employees that their employer advised they were not eligible for overtime pay for various reasons supported a finding of willfulness, and, therefore, the court applied the three-year statute of limitations. 346 F.3d 908, 918–19 (9th Cir. 2003). In *Hugler v. Westside Drywall, Inc.*, No. 3:15-cv-02411-BR, 2017 WL 1027026, *6 (D.Or. Mar. 14, 2017), the employer specifically told the employees that they were not eligible for overtime pay. Judge Brown concluded that this indicated at least reckless disregard for the requirements of the FLSA. *Id.* In our case, each of defendants' contracts with plaintiff has specifically recited that plaintiff was exempt from overtime, "since this position is categorized as an 'in-home caregiver/companion'." Exhibit 3 to Llanes Dec. at AZ0231–32, AZ0019–20, and AZ0024–25. Defendants' violations were therefore willful.

It should also be noted that Ms. Zalewski testified that she routinely researches the wage-and-hour requirements for her resident managers. Zalewski deposition, Exhibit 3 to Egan Dec., at 76:7–77:15:

                              76
      7    Q.  Okay.  Let's go to AZ-30.  So where did
      8    you get this from?
      9    A.  Where did I get this paper from?
     10    Q.  Yeah.
     11    A.  Off of their website.
     12    Q.  Okay.  So this was from the internet.
     13    It's photocopied, so I couldn't tell if it was from
     14    a book or -- you printed this directly from the
     15    internet?
     16    A.  Oh, yeah.  Yeah.
     17    Q.  And then do you follow these kind of on a

18  regular basis, you know, developments in the law?
19  A.  Yeah.  Yeah, definitely.  I definite had
20  my eye open to the changes that are occurring.
21  Q.  Okay.  Do you know when you printed this?
22  Was this to give stuff to me?  Or was this from
23  before?
24  A.  Oh, no, I have kind of something similar
25  to this with all of my research, you know, what's
            77
1  changing?  What do I need to do?  Is this going to
2  work?  As I said, that's kind of just how I operate.
3  Q.  So this is stuff that you -- I don't mean
4  to interrupt you, but let me see if I can summarize.
5  Is this stuff that you kind of research and print
6  out as time goes by?
7  A.  Right.
8  Q.  This wasn't just a big sit-down project
9  that you did for the litigation?
10  A.  Oh, no.  No.
11  Q.  This is stuff you knew of at the time?
12  A.  Yeah, these are things that I've collected
13  sort of overtime.  And then when the update comes, I
14  get out my book and put the new one there and kind
15  of do my homework on that.

Ms. Zalewski produced some of this periodic research in discovery. Exhibit 4 to Egan

Dec. at AZ0030–51. That research specifically notes that (a) the FLSA "companionship

services" exemption does not apply to third-party employers (*i.e.*, employers other than

the aged/infirm person), and (b) it does not apply if "providing assistance with activities

of daily living (e.g., preparing meals, driving, light housework, managing finances,

assisting with medications, and intimate personal care such as dressing or bathing)"

exceeds 20% of the total hours worked per week. *Id.* at AZ0031–33. Defendants were

third-party employers, and providing assistance with activities of daily living was

plaintiff's main duty as a resident care manager. In addition, defendants printed out and

==highlighted== the BOLI FAQ section on domestic service that specifically and explicitly

provides that third-party employers must continue to pay the federal minimum wage

and pay overtime even if exempt under Oregon law. *Id.* at AZ0036–37. Defendants also

**Plaintiff's Motion for Summary Judgment**                    Page 16

printed out and *starred* and ==highlighted== the Oregon Administrative Rule specifically noting that when an employer qualifies for a state exemption but not a federal exemption, the employer is required to comply with federal law. *Id.* at AZ0038.

Plaintiff is therefore entitled to summary judgment on this defense.

### D. Silver Ridge has no valid *in pari delicto* defense

Defendant Silver Ridge Adult Foster Care Home LLC has alleged:

**FOURTH AFFIRMATIVE DEFENSE**
**(In pari delicto)**
17.
While employed at Silver Ridge, the plaintiff ran her own culinary business out of Silver Ridge's facility at 958 SW 174th Place, Beaverton, Oregon. A business card from the plaintiff's Facebook account with Silver Ridge's phone number and address is attached as Exhibit 1 to this Amended Answer. Plaintiff used Silver Ridge's food and other resources to operate and maintain this business without permission. Plaintiff neglected her duties to Silver Ridge's clients.

Silver Ridge has not cited any authority applying an *in pari delicto* defense to FLSA claims. The common law *in pari delicto* doctrine, which prevents a plaintiff who has participated in wrongdoing from recovering damages resulting from the wrongdoing, "has limited applicability to federal law claims." *Vallejo v. Azteca Elec. Const. Inc.*, No. CV-13-01207-PHX-NVW, 2015 WL 419634, *4–5 (D.Ariz. Feb. 2, 2015). For example, the doctrine has been found to bar recovery in a private action for damages under federal securities law "on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of the suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310–11 (1985). The second *Bateman Eichler* prong requires careful consideration of public policy implications to ensure that "broad judge-made law does

**Plaintiff's Motion for Summary Judgment**                     Page 17

not undermine congressional policy favoring private suits as an important mode of enforcing federal securities statutes." *Pinter v. Dahl,* 486 U.S. 622, 633 (1988).

The *Pinter* court stressed the level of culpability that a plaintiff must possess before their remedies will be foreclosed for their part in the alleged wrongdoing. The court stated: "The plaintiff must be an active, voluntary participant in the unlawful activity *that is the subject of the suit*.... Unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated." *Id.* 486 U.S. at 636 (emphasis added). The Court also repeated *Bateman Eichler*'s admonition that "a plaintiff's recovery may be barred only if preclusion of suit does not offend the underlying statutory policies." *Id.* at 637–38.

The Eleventh Circuit has considered the *in pari delicto* defense in the context of the FLSA. *Lamonica v. Safe Hurricane Shutters, Inc.,* 711 F.3d 1299, 1306–09 (11th Cir.2013). In *Lamonica,* the court found the first prong of the *Bateman Eichler* test was not satisfied and did not decide whether the *in pari delicto* doctrine could ever be applied in an FLSA action without interfering with its underlying policies. 711 F.3d at 1308. Although the plaintiffs in that case failed to accurately report income to the IRS and one was an unauthorized alien who used a false Social Security number, the court concluded that the *in pari delicto* defense did not apply because the plaintiffs did not participate in the defendants' decision whether to pay them overtime wages in compliance with the FLSA. *Id.* at 1309. "The plaintiff must be an active, voluntary participant in the unlawful activity *that is the subject of the suit." Id.* (quoting *Bateman Eichler* and adding emphasis); *Bautista Hernandez v. Tadala's Nursery, Inc.,* 34 F.Supp.3d 1229, 1237–38 (S.D.Fla. 2014) (unauthorized alien who provided a false

Social Security number and made false representations to avoid tax obligations was entitled to FLSA protections because he did not participate in determining the employer's overtime compensation practices).

Similarly, in *Sanchez–Calderon,* 995 F.Supp. 1098, 1108 (D.Or.1997), Judge Hubel considered whether plaintiffs should be foreclosed any recovery on their FLSA claims under the *in pari delicto* doctrine. Defendants contended the doctrine should apply because the plaintiff agricultural workers had not registered with the farm and may have avoided immigration and internal revenue laws in the process. The court concluded that the defendants had not proven that the plaintiffs bore at least substantially equal responsibility for the FLSA violations they alleged, and that to apply the *in pari delicto* doctrine at the summary judgment stage would interfere with the highly remedial nature of the FLSA. *Id.*

Defendants in this case have neither pled nor proven that plaintiff had any part in their FLSA violations, and the policies underlying the FLSA do not support the application of *in pari delicto*. The Court should therefore grant plaintiff summary judgment on this defense.

### E.  Silver Ridge acted willfully

Defendant Silver Ridge Adult Foster Care Home LLC has alleged:

**FIFTH AFFIRMATIVE DEFENSE**
**(Failure to state a claim - willfulness)**
18.

> Plaintiff has not stated any facts to support its allegation that Silver Ridge acted willfully and cannot do so.

Plaintiff is unsure what this defense is supposed to mean. Aside from the statute of limitations (discussed above), willfulness is not an element of plaintiff's FLSA claims. Defendant must produce evidence and authority to support this defense, or plaintiff will

be entitled to summary judgment.

## III. Plaintiff is entitled to summary judgment on defendants' counterclaims

Defendants have produced no evidence entitling them to relief on any of their counterclaims. Plaintiff is therefore entitled to summary judgment.

### A.  Andrea Zalewski's first counterclaim is invalid

Ms. Zalewski has pled, as her first counterclaim:

> 1. . The defendant claims that the PLAINTIFF in fact owes the DEFENDANT funds in the amount of $750.

Ms. Zalewski has not pled any facts supporting the supposed nature of this counterclaim, nor provided any evidence supporting it. Plaintiff is therefore entitled to summary judgment.

### B.  Andrea Zalewski's second "counterclaim" is invalid

As her second counterclaim, Ms. Zalewski has alleged:

> 2. The defendant claims that PLAINTIFF illegally operated a business out of defendants care home without the knowledge of Lessor of home or Owner of business, Andrea Zalewski. This occurred while PLAINTIFF was supposed to be caring for the residents in the care home. No monetary damages are requested.

This "counterclaim" is defective in at least two regards. First, if no monetary damages are requested, it is not really a counterclaim. Because defendant has by definition not alleged facts supporting an actual claim for relief, plaintiff should be granted summary judgment on this "counterclaim."

Second, defendants' allegations are simply not supported by the evidence. Ms. Zalewski admitted that she has no evidence that plaintiff ever made any money from selling food prepared at the home. Zalewski deposition, Exhibit 3 to Egan Dec. at 44:2 to 44:4 ("I mean, obviously, I don't have proof of any money that was made.  I would never claim to have proof of that."); 45:9 to 46:1 ("Q. All right. And so is there any amount of

money that you're claiming damages for as a result of this? A. I really don't know. I guess I just wanted it to be on record that that's what was going on. ... Sometimes not everything has to do with money. Right?). Ms. Zalewski has also admitted that plaintiff would have been within her rights to cook food, even for commercial purposes, during her breaks. *Id.* at 71:5 to 71:10 ("[A. O]n page 18 it says, 'You will be responsible for setting your own break times, which should at least be three hours a day.' That could be lunch, that could be making her own food to sell out of my home, that could be hanging out with her boyfriend. That didn't matter to me.").

More importantly, plaintiff simply never made food for sale while working for defendants. Llanes Dec. at ¶ 12. Plaintiff is therefore entitled to summary judgment on this counterclaim, to the extent that it is a counterclaim.

## C. Andrea Zalewski's third "counterclaim" is invalid

As her third "counterclaim," Ms. Zalewski has alleged:

> 3. The defendant claims that the PLAINTIFF made a copy of the key to the care home and allowed her boyfriend access to the home as his primary residence without the consent of Lessor of the home or Owner of the business, Andrea Zalewski. No monetary damages are requested.

As with the second counterclaim, Ms. Zalewski is not seeking any monetary damages for this allegation. Because defendant has by definition not alleged facts supporting an actual claim for relief, plaintiff should be granted summary judgment on this "counterclaim."

Second, the allegations happen to be factually inaccurate. Ms. Zalewski specifically obtained a background check for plaintiff's fiancé so that he could stay with plaintiff. Zalewski deposition, Exhibit 3 to Egan Dec. at 55:12 to 55:23 (" Did you know that he was living there? A. I knew that he was a frequent visitor, and I was certainly okay with that. Q. Okay. A. Jesusa came to me and said, Hey, you know, Dan's hanging out here

and spending time with me, again, while on shift.  And I was totally fine with that.  You

know, I don't run a prison.  Certainly, she had plenty of free time to spend with friends

or family or boyfriends.  So we went ahead and did the criminal background check.");

Llanes Dec. at ¶ 13.

## D.  Silver Ridge's counterclaim is invalid

Defendant Silver Ridge Adult Foster Care Home LLC has pled:

> 17.
>
> While employed at Silver Ridge, the plaintiff ran her own culinary business out of
> Silver Ridge's facility at 958 SW 174th Place, Beaverton, Oregon. A business
> card from the plaintiff's Facebook account with Silver Ridge's phone number and
> address is attached as Exhibit 1 to this Amended Answer. Plaintiff used Silver
> Ridge's food and other resources to operate and maintain this business without
> permission. Plaintiff neglected her duties to Silver Ridge's clients.
> …
>
> ### FIRST COUNTERCLAIM
> #### (Quantum meruit, conversion, and unjust enrichment)
> 21.
>
> Paragraph 17 above is incorporated herein.
> …
>
> 25.
>
> As a result of plaintiff's conduct, Silver Ridge has been damaged.

First, as with Ms. Zalewski's third "counterclaim" above, it is unclear how Silver Ridge

Adult Foster Care Home LLC would have been damaged even if the above allegation

were true. Ms. Zalewski admitted that she has no evidence that plaintiff ever made any

money from selling food made in her home. Zalewski deposition, Exhibit 3 to Egan Dec.

at 44:2 to 44:4 ("I mean, obviously, I don't have proof of any money that was made.  I

would never claim to have proof of that."); 45:9 to 46:1 ("Q. All right. And so is there any

amount of money that you're claiming damages for as a result of this? A. I really don't

know. I guess I just wanted it to be on record that that's what was going on.  …

Sometimes not everything has to do with money. Right?). Ms. Zalewski has also

admitted that plaintiff would have been within her rights to cook food, even for

commercial purposes, during her breaks. *Id.* at 71:5 to 71:10 ("[A. O]n page 18 it says, 'You will be responsible for setting your own break times, which should at least be three hours a day.' That could be lunch, that could be making her own food to sell out of my home, that could be hanging out with her boyfriend.  That didn't matter to me.").

More importantly, plaintiff simply never made food for sale while working for defendants. Llanes Dec. at ¶ 12. Plaintiff is therefore entitled to summary judgment on this counterclaim.

## IV. Plaintiff is entitled to summary judgment on her own counterclaims

Plaintiff is entitled to summary judgment on her counterclaims.

## A. Plaintiff is entitled to summary judgment on her eviction counterclaim

Business owners cannot engage in self-help to eject employees who reside on their property; they must resort to the statutory FED process to evict them. *See* O.R.S. § 91.122(2) ("An employee of a resident of a dwelling unit whose occupancy is conditional upon employment in and about the premises, and members of the employee's household, may only be evicted pursuant to ORS 105.105 to 105.168 after at least 24 hours' written notice of the termination of employment or a notice period set forth in a written employment contract, whichever is longer.").

In our case, defendants terminated plaintiff, giving her written notice to vacate within 30 days. Llanes Dec. at ¶ 14 and Exhibit 4. Approximately a week into that period, however, defendants changed the locks while plaintiff was gone, and had 10 of Ms. Zalewski's friends and neighbors carry all of plaintiff's belongings out and dump them on the driveway. Llanes Dec. at ¶ 14; Zalewski depo, Exhibit 3 to Egan Dec. at 89:22 to 90:25, 93:2 to 94:2:

89

22   Q.  And then, so what did you do to kind of

**Plaintiff's Motion for Summary Judgment**                    Page 23

23  exercise self help in this situation, from what I
24  understand?
25      A.   Well, I did the wrong thing, I can tell
                90
1  you that. And that was after reaching out to DHS,
2  reaching out to APS, Adult Protective Services, Hey,
3  what can I do to protect these individuals?  You
4  know, I don't know what's going to happen.  If it
5  had just been her, you know, things would have gone
6  a little bit differently, I think.  But now we're
7  dealing with someone that I just quite frankly don't
8  know. So again, after exhausting my resources of,
9  you know, Hey guys, help me out here.  No one wants
10  to get involved.  It's a civil matter.
11      Even the police -- even when I said to the
12  police, Hey, look, I've got to do something.  I have
13  these protected individuals here.  What can I do?
14  What are my rights?  We know what everyone else's
15  rights are, but what are mine? You know, what can I
16  do?  And they didn't have an answer for me.  So I
17  made the wrong move.  I fully admit my
18  responsibility in that.  And I graciously got 10
19  neighbors and friends saying, Hey, this isn't right.
20  This is wrong. We're going to help you out, and
21  moved all of her things onto the driveway, covered
22  everything, was respectful towards things.  We
23  didn't throw things around.  And I very promptly
24  changed the locks on the home to protect the clients
25  in the home.
...
                93
2  I very quickly realized, this is just not
3  the right thing to do.  I understand that it was a
4  stressful time and that it would take time for
5  Jesusa to find a hew place to stay.  I sort of
6  figured she had family and friends that would help
7  out.  In this case, I know I do, and I don't really
8  have many family or friends here.  But in an event
9  like this, I would have come up with something.
10      So as a sign of sort of good faith and
11  backstepping and going, Hey, you know, calm down.
12  What can we do to resolve this without further
13  issue?  I then told the police that I would pay for
14  30 days of hotel costs for her and this other person
15  and her son or whoever needed to be there, and that
16  I would also pay for storage fees, just to kind of
17  end the madness, put an end to it, and put my
18  residents at ease, be able to protect them and sort

**Plaintiff's Motion for Summary Judgment**                    Page 24

19  of just move on.
20          Unfortunately, they did not take me up on
21  that offer.  And the police officer then came back
22  in and said, No, they want you to take their things
23  and move them back into the care home, which I
24  didn't do.  They ended up moving the things, then,
25  back into the care home, and the police then forced
                            94
1  me to give them the new keys to the care home to
2  them, after I had changed the locks.

Plaintiff is therefore entitled to summary judgment on liability for her eviction

counterclaim. O.R.S. 105.005. The issue of damages is reserved for the jury.

## B.  Plaintiff is entitled to summary judgment on her conversion counterclaim

Conversion is an intentional exercise of dominion or control over a chattel that so

seriously interferes with the right of another to control it that the actor may justly be

required to pay the other the full value of the chattel. *See, e.g.*, *Mustola v. Toddy*, 253 Or

658, 663 (1969). As laid out in section IV.A. above, defendants admit that they gathered

up all of plaintiff's belongings, including perishable food and fragile and sentimental

items and equipment, and dumped them out on the driveway. Plaintiff also swears to

these events, and to the damages suffered as a result. Llanes Dec. at ¶ 14. That is

sufficient to prove conversion.

Plaintiff is therefore entitled to summary judgment on the issue of liability for her

conversion counterclaim. The issue of damages is reserved for the jury.

## C.  Plaintiff is entitled to summary judgment on her intentional infliction of emotional distress counterclaim

The elements of intentional infliction of emotional distress are (1) that the

defendants intended to inflict severe mental or emotional distress or that the distress

was certain or substantially certain to result from the conduct; (2) That the acts in fact

caused the plaintiff severe mental or emotional distress; and (3) that the acts consisted

of some extraordinary transgression of the bounds of socially tolerable conduct or exceeded any reasonable limit of social toleration. *Schiele v. Montes,* 231 Or. App. 43, 48 (2009).

In this case, it is uncontroverted that, despite giving plaintiff written notice that she had 30 days to vacate the premises, defendants changed the locks just 10 days later while plaintiff was away from the house, without warning, and had 10 of their friends and neighbors dump all of plaintiff's belongings out onto the driveway. As a matter of law, severe mental or emotional distress was certain or substantially certain to result from the defendants' conduct, and those acts were an extraordinary transgression of the bounds of socially tolerable conduct or exceeded any reasonable limit of social toleration.

And defendants' conduct did in fact cause plaintiff severe mental and emotional distress. Plaintiff has testified that she didn't know where she was going to eat or sleep, she became confused and overwhelmed at the time of the lockout, and that defendants broke, destroyed, or lost items of sentimental value such as family pictures and wedding rings that she and her fiancé Dan had bought together in the Philippines. Llanes Dec. at ¶ 14. That is in addition to the predictable spoilage of plaintiff's food after being dumped on the driveway and left there.

Plaintiff is therefore entitled to summary judgment on the issue of liability with regard to this counterclaim. The issue of damages is reserved for the jury.

## V. Conclusion

For all of the above reasons, plaintiff is entitled to summary judgment on her claims, defendants' affirmative defenses, defendants' counterclaims, and plaintiff's own counterclaims. Defendants have neither a legal nor a moral entitlement to their own

private Filipina house slave, which is really what this case is all about. Ms. Zalewski tried to convince plaintiff's counsel early in the case that the way she treated Ms. Llanes was the industry standard. He didn't fall for it, and neither should the Court. This situation should be a source of shame to all of us, because abusing the caregivers hurts both the caregiver and the cared for. The American people are better than that, but we do need to be vigilant in enforcing the laws that protect the most vulnerable among us. Sooner or later, we all grow helpless, so it is in all of our interests to practice the golden rule.

DATED this 30th day of April, 2019

                                        Jon M. Egan, PC

                                        *s/ Jon M. Egan*
                                        _____
                                        Jon M. Egan, OSB No. 002467
                                        Attorney for Plaintiff